121 P.3d 391

Nicanor E. CASUMPANG, Jr., Plaintiff–
Appellant/Cross–Appellee,

v.

ILWU LOCAL 142, Defendant–
Appellee/Cross–Appellant.

No. 24508.

Supreme Court of Hawai'i.

Oct. 18, 2005.

Shawn A. Luiz, on the briefs, for plaintiff-appellant/cross-appellee.

Herbert R. Takahashi and Rebecca L. Covert (of Takahashi, Masui & Vasconcellos), on the briefs, for defendant-appellee/cross-appellant.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by MOON, C.J.

Plaintiff-appellant/cross-appellee Nicanor E. Casumpang, Jr. and defendant-appellee/cross-appellant International Longshore and Warehouse Union, Local 142 [hereinafter, the union or ILWU], respectively, appeal and cross-appeal from the District Court of the Second Circuit's [1] July 19, 2001 findings of fact (FOFs), conclusions of law (COLs), and Order dismissing (1) Casumpang's complaint in assumpsit for unused vacation pay against ILWU and (2) ILWU's counterclaim to enforce a fine issued by ILWU's Judicial Panel against Casumpang. On appeal, Casumpang contends that the district court erred in dismissing his complaint inasmuch as (1) the court's finding that ILWU had no policies permitting payment for unused vacation was clearly erroneous and (2) the court's conclusion that the definition of "wages" in Hawai'i Revised Statutes (HRS) § 388–1 (1993) did not include payment for unused vacation constituted an error of law. As discussed more fully in Section III.A., *infra*, we hold that the district court did not err in dismissing Casumpang's complaint because (1) the policy allegedly allowing the payment of unused vacation was not introduced at trial and (2) "wages," as defined in HRS § 388–1, does not include vacation pay.

In its cross appeal, ILWU contends that the district court erred in dismissing its counterclaim based on its conclusion that it was not obligated to enforce a fine levied by the Judicial Panel against Casumpang. Specifically, ILWU avers that the district court's conclusion was based on an erroneous deter-

---

1. The Honorable Douglas H. Ige presided over the matters pertinent to this appeal.

mination that the union's constitution did not permit the Judicial Panel to impose fines on its members or officers for violating the provisions of the ILWU constitution. For the reasons discussed in Section III.B., *infra*, we hold that, contrary to the district court's conclusions, the ILWU constitution and by-laws permitted the imposition of a fine against Casumpang. We agree with the district court's determination that the fine was reasonable.

Accordingly, we affirm the district court's dismissal of Casumpang's claim and vacate its dismissal of ILWU's counterclaim. We remand this case to the district court with instructions to enter judgment in favor of ILWU and against Casumpang in the amount of $7,636.

## I. BACKGROUND

During the 1980's, Casumpang became a member of ILWU by virtue of his employment as an electrician with the Hawaiian Commercial Sugar Company, whose employees were represented by ILWU. On or about February 3, 1993, Casumpang was employed as a full-time official, *i.e.*, division representative, of the ILWU Local 142. In late 1994, Casumpang was elected to serve a three-year term, from January 2, 1995 to December 31, 1997, as an ILWU business agent. Business agents are full-time union officers who are responsible for negotiating collective bargaining agreements, processing grievances, and providing various educational, training, and membership services for members.

### A. Casumpang's Claim

The position description for business agents provided for an annual salary of $42,780 per year plus personal, automobile, and travel allowances, resulting in a total annual compensation of $50,050.12. Addi-

tionally, the position description provided for, *inter alia*, "4 weeks of vacation after one year of service."

Although Casumpang's term of office was scheduled to terminate on December 31, 1997, ILWU extended his employment until January 19, 1998, pending the outcome of a contested union election, in which Casumpang was a candidate, and the results of internal disciplinary proceedings that were initiated against him. Casumpang's last day of work as a business agent was January 17, 1998, and he was officially separated from employment with ILWU on January 19, 1998.

On March 20, 1998, Casumpang submitted a written request for twenty-four days of unused vacation leave that he failed to use prior to his separation from the union. ILWU's secretary-treasurer denied this request on the ground that Casumpang was no longer an employee of ILWU. On April 27, 1998, Casumpang filed a complaint with the enforcement division of the Department of Labor and Industrial Relations (DLIR) for unpaid "wages" under HRS Chapter 388. However, on May 19, 1998, the DLIR informed Casumpang that he was exempt from the DLIR's services under HRS § 388–11(b) (Supp.1999) due to his status as a union business agent.[2] Casumpang did not appeal the DLIR's decision.

On October 13, 1998, Casumpang filed a complaint in the district court against ILWU for $5,688.24, the amount he claimed ILWU was contractually obligated to compensate him for his twenty-four days of unused vacation. On July 12, 1999, the district court dismissed Casumpang's complaint for lack of subject matter jurisdiction. Casumpang appealed the dismissal, and this court reversed and remanded the case in *Casumpang v. ILWU Local 142*, 94 Hawai'i 330, 13 P.3d

---

2. HRS § 388–11 provides in pertinent part:
    **Employees remedies.** (a) Action by an employee to recover unpaid wages may be maintained in any court of competent jurisdiction by any one or more employees....
        (b) *Except for claims filed by individuals employed in a bona fide executive, administrative, or professional capacity* or in the capacity of an outside salesperson, whenever the director of labor and industrial relations determines that

wages have not been paid, and that the unpaid wages constitute an enforceable claim, the director may upon request of the employee take an assignment in trust for the wages without being bound by any of the technical rules respecting the validity of any such assignments and may bring any legal action necessary to collect such claim.
(Emphasis added.)

1235 (2000). Following a bench trial on June 25, 2001, the district court entered FOFs, COLs, and an Order, dismissing Casumpang's complaint on July 19, 2001. Therein, the district court concluded:

### Conclusions of Law

. . . .

3. Casumpang has "fashioned his claim for relief as one in assumpsit for $5,688.24 allegedly owed him by the union as vacation pay." *Casumpang v. ILWU Local 142*, 9[4] Hawai'i 330, 335, 13 P.3d 1235 (2000).

4. A claim for assumpsit is a common law form of action which allows for the recovery of damages for non-performance of a contract, either express or implied, written or verbal. *Helfand v. Gerson*, 105 F.3d 530 (9th Cir.1997); *Forbes v. Hawaii Culinary Corp.*, 85 Hawai'i 501, 507–08, 946 P.2d 609 (App.1997); *Schulz v. Honsador*, 67 Haw. 433, 435, 690 P.2d 279, 281 (1984).

5. It has long been recognized under Hawai'i law that an employee is not entitled to "pay" for vacation benefits which are unused during the period of employment, unless there is an express policy (or contractual obligation) to the contrary. *Lim v. Motor Supply, Ltd.*, 45 Haw. 111, 122, 364 P.2d 38, 44–45, *reh'g denied*, 45 Haw. 198, 364 P.2d 38 (1961). Other state courts have also held that absent a contract which requires an employer to pay for unused vacation at the time of separation or termination, an employer is not obligated to pay for such a claim as "wages." *Kafka v. State of Illinois*, 1982 WL 43377 (Ill.Ct.Cl.1982) (finding under terms of employment discharged employee not entitled to pay in lieu of unused vacation); *New Mexico State Labor & Indus. Comm'n v. Tolman v. Deming Nat'l Bank*, 96 N.M. 673, 634 P.2d 695 (1981) (finding employer's failure to pay out resigning employee's unused vacation pay was not contrary to public policy); *Phillips v. Memphis Furniture Mfg. Co.*, 573 S.W.2d 493 (Tenn.App.1978) (finding that a vacation with pay contemplates employment at the time of the vacation); *see also* 53 Am. Jur.2d *Master and Servant* § 80 (1970) (finding any right to pay in lieu of vacation is dependant on terms of the employment).

6. Section 388–1, HRS, does not specifically include within the definition of "wages" unused vacation leave following separation or termination from employment.

7. In this case since Casumpang has failed to establish any proof that ILWU Local 142 has a written or oral policy, house rule, convention resolution or practice which affords to its employees the right to convert unused vacation leave benefits at the time of separation or termination from employment into "pay," he fails to state a claim for relief in "assumpsit" or a claim for unpaid wages under chapter 388, HRS.

Casumpang subsequently filed his notice of appeal, which, although premature, was deemed timely filed on September 21, 2001.[3]

■ On August 27, 2001, Casumpang filed a motion for relief under Rule 60(b) of the District Court Rules of Civil Procedure (DCRCP)[4] from the July 19, 2001 order on the ground that ILWU failed to produce at trial a 1997 vacation policy that would afford him compensation. The district court granted the motion on October 19, 2001.[5] Subse-

---

**3.** Casumpang filed the notice of appeal on August 20, 2001 while ILWU's motion to alter or amend the July 19, 2001 order, discussed *infra*, was pending. Thus, it was a premature notice and is considered filed on the day the court disposed of ILWU's motion. Hawai'i Rules of Appellate Procedure (HRAP) Rules 4(a)(2) and (3).

**4.** DCRCP Rule 60(b) states in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, or-der, or proceeding for the following reasons: . . . (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party . . . (6) any other reason justifying relief from the operation of the judgment.

**5.** We note that the district court's order was issued (1) while the instant appeal was pending, and (2) without a remand of the case from this court and is therefore void. *See Life of the Land v. Ariyoshi*, 57 Haw. 249, 252, 553 P.2d 464, 466 (1976).

quently, Casumpang moved to dismiss this appeal and ILWU's cross appeal, discussed *infra*, for lack of jurisdiction, arguing that the July 19, 2001 order is no longer final and appealable because of the October 19, 2001 order granting him relief. This court denied Casumpang's motion to dismiss on December 5, 2001.

### B. *ILWU's Counterclaim*

On April 2, 1996, members of ILWU filed written charges against Casumpang for allegedly violating Article II, section 1 of ILWU's Constitution [6] by engaging in electrical contractor work while serving as a full-time union official.[7] Article II, section 1 provides in pertinent part that "[e]lected and appointed full-time officials of the [union], while on the [union] payroll, shall not be permitted to hold any other gainful position unless authorized by the Executive Committee with the approval of the Local Executive Board." The intent and purpose of Article II, section 1 is

> to ensure that full-time officials of the ILWU Local 142 perform their duties and responsibilities with complete loyalty to the interests of employees represented by the union and a single minded purpose, i.e. to protect and advance their interests. Assuming any other "gainful position" while serving as a full-time elected official of the Local is a "conflict of interest."

The written charges were referred to ILWU's Trial Committee [8] and trial was scheduled for April 16, 1996. Prior thereto, the parties agreed to waive their right to a trial and to proceed before the Trial Committee based upon stipulated findings of fact. The stipulated findings of fact stated, *inter alia*, as follows:

> 4. The parties stipulated that Brother Casumpang while engaged in a gainful position did not comply with Article II, section 1 of the ILWU Local 142 Constitution; he did not have authorization by the Local Executive Committee with the approval of the Local Executive Board.

> 5. The parties stipulate that Brother Casumpang did not act intentionally to violate Article II, Section 1 of the Constitution when he was engaged in a gainful position; however, his ignorance does not excuse that he was in fact guilty of violating Article II, Section 1 of the Constitution when he held a gainful position while employed as a full-time elected official of the Union.

The Trial Committee, on April 16, 1996, entered the following "Determination of the Maui Division Trial Committee":

> Having now considered the facts as stipulated above, the Trial Committee makes

---

6. During Casumpang's term of office, ILWU's constitution was amended. Although there are no material differences between the former and amended provisions that apply in the instant case, Casumpang was charged and adjudicated under provisions of both versions. Thus, for the sake of clarity, any references to the former constitution will be cited by its specific number (*e.g.,* section 2.01); references to the amended constitution will be cited by its article and section designation (*e.g.,* Article II, section 1).

7. The April 2, 1996 written charges stated, *inter alia:*

> 7. On or about February 10, 1993 and thereafter while serving as an elected and/or appointed full-time official of the ILWU Local 142, and on the Local's payroll, [Casumpang] held another gainful position, to wit: an electrical contractor in the State of Hawaii.
>
> . . . .
>
> 11. On or about February 19, 1996[, Casumpang] admitted to the Titled Officers that he was in fact engaged in the contracting busi-

ness since prior to his election as a business agent.

> 12. On or about February 19, 1996[,] the Titled Officers requested [Casumpang] to provide within five days all business and tax records of his contracting business for the years 1994 to 1995 and to disclose his earnings from said engagements. [Casumpang] failed to provide the requested information to the Titled Officers.
>
> 13. On or about March 11, 1996 and March 16, 1996[,] the [T]itled [O]fficer[s] requested [Casumpang] for the second and third time to submit all business and tax records of his contracting business for the years 1994 and 1995 and to disclose his earnings from said engagements. [Casumpang] failed to provide the requested information.

8. The Trial Committee was composed of five union members in good standing and was responsible for hearing all charges against union officers and members for violations of ILWU's constitution and bylaws.

the following determination of guilt and fixing of remedy:

1. Brother Casumpang is guilty of violating Article II, Section 1 of the ILWU Local 142 Constitution.

2. As of April 18, 1996, Brother Casumpang shall cease and desist from his activity as an electrical contractor;

3. That prior to engaging in any future "gainful position" as an electrical contractor, Brother Casumpang shall seek and secure prior authorization from the Local Executive Committee [ (LEC) ] and approval from the Local Executive Board [ (LEB) ] pursuant to Article II, Section 1 of the Constitution.[9]

*Id.*

On January 7, 1998, members of ILWU again filed written charges against Casumpang, alleging, *inter alia,* that Casumpang had violated Article II, section 1 of the union's constitution as well as the Trial Committee's cease and desist order. Specifically, the charges alleged that Casumpang had continued to engage in electrical contracting duties on ten separate occasions since May 6, 1996.[10] On the same day, Casumpang was provided written notice of the charges and that a hearing and trial before ILWU's Judicial Panel[11] was scheduled for January 16, 1998.

During Casumpang's trial, all parties were afforded a full and fair opportunity to call their own witnesses, cross examine opposing witnesses, and present documentary and other evidence. At no time during the hearing did any party challenge any of the five members of the Judicial Panel on grounds of bias or prejudice.

On January 17, 1998, the Judicial Panel entered a written decision and order pursuant to section 27.10 of the union's constitution.[12] According to the order, the Judicial

---

9. On April 22, 1996, Casumpang submitted a request to the LEC for authorization to "conduct an electrical contracting business" while employed with the union; however, on June 4, 1996, the LEC denied his request pursuant to Article II, Section 1 of the ILWU's constitution.

10. The written charges alleged that:

11. Commencing on and after May 6, 1996[,] Casumpang repeatedly violated the Maui Division Trial Committee's order that he "cease and desist from his activity as an electrical contractor." Casumpang submitted electrical permit applications as an electrical contractor, d/b/a Sea Breeze Electric, and obtained approval to perform work as an electrical contractor from the Department of Public Works, County of Maui on the following dates and for the following home owners or tenants:
   a. On May 6, 1996 for Mr. and Mrs. Felino Garcia.
   b. On June 13, 1996 for Mr. and Mrs. Stan Chong Kee.
   c. On July 16, 1996 for Mr. and Mrs. Primo Baldonado.
   d. On August 12, 1996 for John Kaaea and Rebecca Cabinilla.
   e. On October 12, 1996 for Lori Ann K.K. Guerrero and Richard Kalepa.
   f. On December 5, 1996 for Mr. and Mrs. John Arisumi.
   g. On May 20, 1997 for Eduardo Manlansig & Others.
   h. On July 30, 1997 for E.A. Damaso et. al.
   i. On August 4, 1997 for Mr. and Mrs. Primo Baldonado.
   j. On October 13, 1997 for Mr. and Mrs. Mariano Salcedo.

. . . .
13. When questioned about the aforementioned activities as an electrical contractor on or about December 12, 1997 by the Titled Officers of the ILWU Local 142[,] Casumpang[] deliberately and intentionally lied about said activities in a response dated December 19, 1997 . . . .

11. Pursuant to section 28.01 of ILWU's constitution, the Trial Committee was renamed the Judicial Panel.

12. Section 27.10 provides that, following a trial,

[t]he decision of the Judicial Panel shall consist of the following:
*27.10.1* Verdict of guilty or not guilty.
*27.10.2* Brief statement of what the Judicial Panel found to be the facts.
*27.10.3* *Fixing of punishment, if a guilty verdict is found.*
*27.10.4* When a decision is reached, the Secretary of the
   Judicial Panel shall make a permanent record of it in writing.
*27.10.5* After the decision is reached and recorded, the
   accused shall be called in and informed of the
   decision by the Chair of the Judicial Panel. If the accused is found guilty, the Chair of the Judicial
   Panel shall advise them of their rights of appeals to the Local Executive Board, to the Local membership and to the International Union.
   In an appeal to the Local membership, the

Panel determined that Casumpang knowingly and deliberately violated Article II, section 1 of ILWU's constitution as well as the Trial Committee's April 16, 1996 cease and desist order on nine of the ten separate occasions.[13] The Judicial Panel found that Casumpang's 1996 general excise tax returns showed $7,636 in income from "contracting" activities. The Judicial Panel also found that Casumpang's sole proprietorship, Sea Breeze Electric, reported gross receipts of $16,760.60 for 1995 and 1996. As such, the Judicial Panel issued the following "punishment and order:"

1. Effective June 14, 1996[,] Casumpang is suspended as a member in good standing of ILWU Local 142 for a period of (9) consecutive years.

2. During the period of his suspension as a member in good standing of ILWU Local 142 (a period of 9 years)[,] Casumpang shall neither be eligible for nomination nor serve as an officer of ILWU Local 142 or as an officer or steward of any of the units of ILWU Local 142.

3. Effective January 7, 1998, Casumpang shall receive no further compensation as a business agent and Casumpang is hereby ordered to turn in all union office keys and all papers and property of the union on January 19, 1998 at 12:00 noon to the Secretary Treasurer of the union, or his designee.

> accused shall have the right to appear at each unit
> membership meeting for the purpose of pleading their
> case. The membership of each unit shall vote thereon, and the majority of the total membership's votes shall determine the result.
>
> (Bold and underscored emphases in original.) (Italicized emphasis added.)

13. The written decision and order of the Judicial Panel contained the following relevant findings of fact (FOF):

> 7. Casumpang is the owner and sole proprietor of Sea Breeze Electric, a residential, commercial and industrial electrical contracting business.
>
> 8. Casumpang reported receipt of gross revenues as the owner and operator of Sea Breeze Electric for each year commencing in 1994 as follows:
>
> a. $4,048.96 for the year 1994;
> b. $6,984.00 for the year 1995; and

4. Effective the date of this Decision and Order and continuing up to June 14, 2005[,] Casumpang shall not be permitted to serve in any appointed full-time position in ILWU Local 142.

5. *Within 60 days of the date of this Decision and Order Casumpang shall pay a fine of $7,636 to ILWU Local 142.*

(Emphasis added.)

On January 23, 1998, Casumpang filed an appeal from the decision and order of the Judicial Panel to the LEB. After a hearing on March 19, 1998, the LEB affirmed the Judicial Panel's January 17, 1998 order. On April 18, 1998, Casumpang declined to pay the fine imposed by the Judicial Panel and filed an appeal to the International Union. The appeal was denied on July 1, 1998 for failure to exhaust ILWU Local 142 remedies and for untimeliness.

As previously indicated, Casumpang filed a complaint against ILWU on October 13, 1998 for his unused vacation. Thereafter, on November 20, 1998, ILWU filed a counterclaim to enforce, *inter alia,* the fine of $7,636 imposed by the Judicial Panel in its January 17, 1998 order. In its July 19, 2001 order dismissing Casumpang's complaint, the district court also dismissed the union's counterclaim and listed the following pertinent conclusions of law:

> c. $10,760.60 for the year 1996.
> . . . .
> 22. Casumpang reported receipt of gross revenues as the owner and operator of Sea Breeze Electric for 1996 as follows:
> a. $2,300 for April 1996 through June 1996,
> b. $2,776 for July 1996 through September 1996, and
> c. $2,560 for October 1996 through December 1996.
> . . . .
> 30. . . . .
> . . . .
> b. It is also noteworthy that the charging parties [ (*i.e.,* the union) ] have alleged violations by Casumpang for activities *after April 18, 1996* [ (the effective date of the first cease and desist order) ].
>
> (Citations to exhibits omitted.) (Emphases added.)

8. The constitution, by-laws, and rules of an unincorporated association constitutes a binding contract between the organization and its members, which this court has jurisdiction under state law to enforce. *Martinez v. Parado,* 35 Haw. 149, 153 (1939); *International Association of [Machinists v.] Gonzales,* 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958); *Casumpang v. ILWU Local 142,* 9[4] Hawai'i 330, 13 P.3d 1235 (2000).

9. A labor organization has significant latitude in interpreting and applying its constitution and by-laws to its members and the Court defers to the interpretation and application of Article II, Section I of the ILWU Local 142 to Casumpang in connection with his suspension as an officer and member of the union by decision and order of the Judicial Panel dated January 17, 1998 and the decision and order of the Local Executive Board dated March 19, 1998, for violations of the union constitution on and after April 16, 1999 by Casumpang while serving as a business agent. *See Fulk v. United Transportation Union,* 160 F.3d 405 ( [7th Cir.] 1998) (court defers to union's interpretation of its own constitution so long as the interpretation is not unreasonable); *Akins v. Zeneca[,] Inc.,* 62 F.3d 1417 ( [6th Cir.] 1995) (the court must "defer to union's interpretation of its own constitution," provided it is not unreasonable); *Al[len] v. United Transportation Union,* 964 F.2d 818 ( [8th Cir.] 1992) (absent bad faith, we will defer to the union's interpretation of its own constitution).

10. The Court concludes, however, that absent a specific reference in the union constitution which authorizes the imposition of a "fine" by the Judicial Panel, it will not enforce the $7,636 fine imposed on January 17, 1998 by the Judicial Panel.

On July 27, 2001, ILWU moved to amend the July 19, 2001 order pursuant to DCRCP Rule 52 (1996).[14] The district court granted the motion and amended its order on September 21, 2001 to include a finding that ILWU's fine, although unenforceable, was reasonable.[15] ILWU filed its timely notice of cross appeal from the July 19, 2001 order dismissing its counterclaim on August 23, 2001.

## II. STANDARDS OF REVIEW

### A. Findings of Fact and Conclusions of Law

■■■■ In this jurisdiction, a trial court's [findings of fact (FOFs) ] are subject to the clearly erroneous standard of review. An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has been committed.

A [conclusion of law (COL) ] is not binding upon an appellate court and is freely reviewable for its correctness. This court ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned. However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependant upon the facts and circumstances of each individual case.

*Allstate Ins. Co. v. Ponce,* 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004) (citations, quotation marks, and brackets omitted).

---

**14.** DCRCP Rule 52 provides in pertinent part:

(b) **Motion, when to be made.** Upon motion of a party made not later than 10 days after entry of judgment, or upon the hearing of a motion hereunder made by any party, the court may ... make additional findings, and may amend the judgment accordingly[.]

(c) **When Judgment is appealed** .... Notwithstanding the filing of the notice of the appeal, the court shall retain jurisdiction to make and file such findings and conclusions and to amend the judgment to conform thereto, if deemed necessary.

**15.** We note that, although the order amending the July 19, 2001 order was entered subsequent to ILWU's notice of cross-appeal, the district court retained jurisdiction to amend the July 19, 2001 order inasmuch as ILWU filed its motion to amend on July 27, 2001, within ten days of the court's entry of the order. *See supra* note 4.

B. *Statutory Interpretation*

■ "Questions of statutory interpretation are questions of law to be reviewed *de novo* under the right/wrong standard." *Guth v. Freeland,* 96 Hawai'i 147, 149–50, 28 P.3d 982, 984–85 (2001) (citations omitted).

C. *Interpretation of a Contract*

■ "As a general rule, the construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court." *See Cho Mark Oriental Food, Ltd. v. K & K Int'l,* 73 Haw. 509, 519, 836 P.2d 1057, 1063 (1992) (citing *Stewart v. Brennan,* 7 Haw.App. 136, 142, 748 P.2d 816, 821 (1988) (citations omitted)).

## III. *DISCUSSION*

A. *Dismissal of Casumpang's Complaint*

**1. Express Policy**

■ Casumpang contends that the district court erred in dismissing his complaint inasmuch as the court's finding that ILWU had "no written or oral policy, house rule, or convention resolution which affords an employee the right to convert unused vacation leave benefits at the time of separation or termination from employment into 'pay,'" FOF no. 12, was clearly erroneous. Specifically, Casumpang asserts that the policies adopted at ILWU's September 1997 Convention [hereinafter, convention policies] expressly provided for such payment.

HRS § 641–2 (1993) provides in pertinent part that "[e]very appeal should be taken on the record and no new evidence shall be introduced in the supreme court." This court cannot, therefore, consider "matters outside the record which could not have been considered by the trial court at the time its judgment was rendered." *City & County of Honolulu v. Toyama,* 61 Haw. 156, 158 n. 1, 598 P.2d 168, 171 n. 1 (1979); *see also Pickering v. State,* 57 Haw. 405, 409, 557 P.2d 125, 128 (1976). Jurisdiction lies in this court while an appeal is pending, and a motion under Rule 60(b) may be made in the circuit court without a remand of the case. *See Life of the Land v. Ariyoshi,* 57 Haw. 249, 252, 553 P.2d 464, 466 (1976). However, "[i]n the

event that the circuit court determines that the motion should be granted, it should so certify and a motion to remand should be made in this court." *Id.*

In the instant case, Casumpang failed to present the convention policies to the district court during trial or at any time before the court issued its July 19, 2001 order dismissing his complaint. Rather, Casumpang presented the convention policies in support of his DCRCP Rule 60(b) motion to the district court on August 27, 2001. The district court granted the motion on October 19, 2001, despite the fact that Casumpang had already filed his notice of appeal and without a motion for remand in this court. Thus, as previously noted, *see supra* note 5, the Rule 60(b) motion and the order granting it have no effect on this appeal. Because the convention policies were not considered by the district court at the time judgment was rendered, nor was it properly introduced into the record, this court cannot consider them. Accordingly, we affirm the trial court's finding that ILWU did not have an express policy permitting payment for unused vacation.

**2. HRS § 388–3**

■ Casumpang next contends that the district court erred in dismissing his complaint inasmuch as the court improperly concluded that payment for unused vacation is not included within the definition of "wages" as defined by HRS § 388–1.

■ "[W]here the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." *Schefke v. Reliable Collection Agency, Ltd.,* 96 Hawai'i 408, 424, 32 P.3d 52, 68 (2001) (quoting *State v. Kalama,* 94 Hawai'i 60, 64, 8 P.3d 1224, 1228 (2000) (internal quotation marks and citation omitted)). In doing so, this court has noted that:

[O]ur foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire stat-

ute and construe it in a manner consistent with its purpose.

*Korean Buddhist Dae Won Sa Temple of Hawai'i v. Sullivan,* 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998) (quoting *Gray v. Admin. Dir. of the Court,* 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997)). HRS § 388–3 (1993) provides in pertinent part that, "[w]henever an employer discharges an employee either with or without cause, the employer shall pay the employee's *wages* in full at the time of discharge[.]" (Emphasis added.) Under HRS § 388–1, "wages" are defined as

> compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission, or other basis of calculation. It shall include the reasonable cost, as determined by the director under chapter 387, to the employer of furnishing an employee with board, lodging, or other facilities if such board, lodging, or other facilities are customarily furnished by the employer to the employer's employees but shall not include tips or gratuities of any kind[.]

Nowhere in HRS § 388–3 or in the definition quoted above is "vacation pay" mentioned. However, examining other sections of chapter 388 may aid in determining the definition of "wages" inasmuch as "[l]aws *in pari materia,* or upon the same subject matter, shall be construed with reference to each other." HRS § 1–16 (1993); *Zator v. State Farm Mut. Auto. Ins. Co.,* 69 Haw. 594, 597, 752 P.2d 1073, 1075 (1988). In so doing, we are mindful that "[o]ne provision of a comprehensive statute should be read in the context of the other provisions of that statute and in the light of the general legislative scheme." *Yamaguchi v. State Farm Mut. Auto. Ins. Co.,* 706 F.2d 940, 948 n. 11 (9th Cir.1983) (citing *Hudson v. Uwekoolani,* 65 Haw. 468, 471, 653 P.2d 783, 786 (1982) (per curiam); *State v. Kaneakua,* 61 Haw. 136, 140, 597 P.2d 590, 592 (1979); *Pacific Ins. Co. v. Oregon Auto. Ins. Co.,* 53 Haw. 208, 212, 490 P.2d 899, 902 (1971)). And, if possible, a statute should be construed in such a way that no word is void, superfluous or insignificant in light of the presumption that "words used in two or more sections of [the same] statute are presumed to be used in the same sense throughout the statute[.]" *Yamaguchi,* 706 F.2d at 947 (citing *Rodrigues v. State,* 52 Haw. 156, 168, 472 P.2d 509, 518 (1970); *In re City & County of Honolulu Corp. Counsel,* 54 Haw. 356, 373, 507 P.2d 169, 178 (1973)).

In examining chapter 388, we note that HRS § 388–4 states: "Where an employee dies leaving any *wages, vacation, or sick leave pay* due to the employee, the employer shall ... pay the *wages, vacation, or sick leave pay* [to the surviving spouse or adult child]." (Emphases added.) "Vacation" and "sick leave" pay are mentioned separately elsewhere in the chapter, and "wages" alone is mentioned throughout the remaining provisions. Therefore, in construing HRS § 388–3 in the context of the entire statute and HRS § 388–4 in particular, it appears that the legislature intended "wages" to be distinct from "vacation pay." Moreover, there is nothing to indicate that the legislature intended to include "vacation pay" under "wages," and thereby supersede the common law.

The common law rule regarding payment for unused vacation was stated in *Lim v. Motor Supply, Ltd.,* 45 Haw. 111, 364 P.2d 38, *reh'g denied,* 45 Haw. 198, 364 P.2d 38 (1961), wherein this court held that, absent an express agreement or uniform custom, an employee is not entitled to payment for unused vacation following separation from employment. *Id.* at 121–22, 364 P.2d at 44. Two years later, HRS chapter 388 was enacted. Conspicuously absent from the definition of "wages" in HRS 388–1 is any reference to "vacation pay," which we believe indicates the legislature's intent to leave the common law intact. *See Burns Int'l Sec. Serv., Inc. v. Dep't of Transp.,* 66 Haw. 607, 611, 671 P.2d 446, 449 (1983) (noting that the common law will be followed where it does not appear that the legislature's purpose is to supersede such law). Therefore, in reading HRS § 388–3 in the context of the entire statute and in light of the common law, we hold that the district court did not err in concluding that payment for unused vacation upon separation from employment does not constitute "wages" under the plain meaning of HRS § 388–1. Ac-

cordingly, we affirm the district court's dismissal of Casumpang's complaint for failure to state a claim.

### B. *Dismissal of ILWU's Counterclaim*

ILWU asserts that the district court improperly concluded that it was not obligated to enforce the fine levied against Casumpang by the Judicial Panel inasmuch as the district court's conclusion was based on its erroneous determination that the union's constitution did not permit the Judicial Panel to impose fines on its members or officers for violating the constitution's provisions. As such, ILWU requests that this court vacate the district court's dismissal of its counterclaim and, upon remand, require the court to enforce the fine.

### 1. The District Court's Finding that the ILWU Constitution did not Permit the Judicial Panel to Impose Fines

■■■■■ ILWU contends that the district court erred by refusing to defer to the Judicial Panel's good faith and reasonable interpretation of the union's constitution and bylaws. It is well established that

> *the constitution, rules and bylaws* of an unincorporated association[ [16]] if they are not immoral, contrary to public policy or the law of the land, or unreasonable, *constitute a contract between the members which the courts will enforce.*

*Martinez v. Parado,* 35 Haw. 149, 153 (1939) (citation and quotation marks omitted) (emphases added). However, "[c]ourts are reluctant to substitute their judgment for that of union officials in the interpretation of the union's constitution, and will interfere only where the official's interpretation is not fair

or reasonable." *Stelling v. Int'l Bhd. of Elec. Workers,* 587 F.2d 1379, 1388 (9th Cir.1978) (quoting *Vestal v. Hoffa,* 451 F.2d 706, 709 (6th Cir.1971)); *see also Busch v. Givens,* 627 F.2d 978, 981 (9th Cir.1980); *Gordon v. Laborers' Int'l Union,* 490 F.2d 133, 137 (10th Cir.1973).

■■■■ As previously indicated, Casumpang was charged with multiple violations of the April 16, 1996 cease and desist order, issued as a result of Casumpang's violation of Article II, section 1 of the ILWU's constitution. The ILWU's constitution refers specifically to "fines" in sections 25.01,[17] 26.01,[18] and 26.02.[19] None of the remaining sections of the constitution specifically single out "fines" or establish the manner in which they may be imposed. Rather, section 27.10.3, which is the only section authorizing the imposition of punishment, provides the Judicial Panel with the general power to "fix punishment" when it finds an officer or member guilty of violating any section of the constitution.

According to Black's Law Dictionary (6th ed.1990), a "fine" is "a pecuniary punishment or penalty[.]" Additionally, section 3 of ILWU's bylaws states that "[a]ny member refusing to obey the Constitution may be fined, suspended or expelled as the [union] may determine. Any member refusing to obey the Bylaws ... and orders of the Local may be fined, suspended or expelled[.]" Thus, inasmuch as: (1) ILWU's constitution refers to fines; (2) a fine constitutes punishment; (3) the Judicial Panel had the authority to "fix punishment"; and (4) the bylaws expressly authorize the imposition of a fine for refusing to obey the Constitution, Bylaws, or orders, the Judicial Panel's determination that it had the authority to impose fines under the union constitution and bylaws was fair and reasonable. Therefore, the district

---

**16.** The facts are undisputed that ILWU is an unincorporated labor organization.

**17.** Section 25.01 provides in pertinent part that "[t]he income of this [union] shall be derived from dues, fines, assessments, interests on monies in banks and other financial institutions, and any other legal source."

**18.** Section 26.01 provides in pertinent part that "[a] member who is delinquent two (2) months or more in ... fines or assessments shall stand suspended from all union activities and shall be

referred to [union] counsel for appropriate legal action[.]"

**19.** Section 26.02 provides in pertinent part that, "[a] member who is delinquent two (2) months or more in dues, fines or assessments shall stand suspended from all union activities and shall be referred to Local counsel for appropriate legal action upon issuance of a thirty (30) day written notice of delinquency and an opportunity to be current."

court erred by interfering with the Judicial Panel's interpretation of the ILWU constitution and bylaws. Accordingly, we hold that the district court's conclusion that ILWU's constitution did not permit the Judicial Panel to impose fines was clearly erroneous.

## 2. Enforcement of the Fine Assessed by the Judicial Panel Against Casumpang

■ Given that the Judicial Panel was authorized to impose fines under ILWU's constitution, we now turn to the question whether the district court was obligated to enforce the fine assessed by the Judicial Panel against Casumpang. Casumpang contends that, in imposing the fine, the Judicial Panel denied him procedural, as well as substantive, due process inasmuch as (1) the proceedings that resulted in his nine-year suspension and $7,636.00 fine were improper, and (2) the trial court's determination that he received a "full and fair opportunity to be heard was in error."

The enforceability of a fine imposed by a union on one of its members is an issue of first impression in Hawai'i. Courts in other jurisdictions have addressed the issue largely in the context of fines against members who crossed picket lines during union strikes. *See, e.g., Walsh v. Communications Workers of Am., Local 2336,* 271 A.2d 148 (Md.1970); *NLRB v. Allis–Chalmers Mfg. Co.,* 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); *NLRB v. Boeing Co.,* 412 U.S. 67, 69, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973) (upholding a fine of $450.00 for a member who crossed a picket line); *Auto Workers Local 283 v. Scofield,* 50 Wis.2d 117, 183 N.W.2d 103 (Wis. 1971); *Jost v. Communications Workers of Am., Local 9408,* 91 Cal.Rptr. 722 (1970). Generally, courts that have addressed the issue of union fines agree that:

National labor policy is built on the premise that the most effective way for employees to improve their wages, hours and working conditions is to consolidate their strength through a democratically chosen union. Integral to this policy is the union's preservation of its viability which necessitates the power to protect against the erosion of its status through reasonable discipline of members who violate rules and regulations governing membership. *The power to fine a member for violations of union rules is essential if the union is to be an effective bargaining agent. Generally, the provisions set forth in a union's constitution and bylaws, which define punishable conduct and establish the procedures for internal trial and appeal, constitute a contract between the union and its members.* Since federal law does not preclude the imposition of disciplinary fines by unions upon its members or the resort to judicial enforcement of such fines, *state law governs union lawsuits to collect disciplinary fines.* Under Ohio law, unions and other unincorporated associations may sue their voluntary members to collect debts and to enforce discipline. *A disciplinary fine imposed by a union upon its member is a binding contractual obligation that constitutes a debt.*

*Int'l Bhd. of Elec. Workers, Local No. 986 v. Smith,* 76 Ohio App.3d 652, 602 N.E.2d 782, 787 (1992) (citations, quotation marks and brackets omitted) (emphases added). *See also Allis–Chalmers Mfg. Co.,* 388 U.S. at 180–81, 87 S.Ct. 2001. These courts also agree that a union is entitled to judicial enforcement of the fine where: (1) the union imposes a fine on a member pursuant to its constitution and bylaws; (2) the member is afforded due process before the fine is imposed; and (3) the fine is reasonable. *See Communications Workers of Am., AFL–CIO, Local 6003 v. Jackson,* 516 P.2d 529, 532 (Okla.1973); *see also Jost,* 91 Cal.Rptr. 722. Inasmuch as the fine imposed against Casumpang was assessed pursuant to the ILWU constitution and bylaws, we now turn to address the requirements of due process and reasonableness.

### a. *due process*

■ As previously stated, where a union seeks to take disciplinary action against a member, it must first provide the member with due process. *See Jackson,* 516 P.2d at 532; *Jost,* 91 Cal.Rptr. at 725. This court has said that "[d]ue process is not a fixed concept requiring a specific procedural course in every situation. Rather, due process is flexible and calls for such procedural

protections as the particular situation demands[ ]" and that "[t]he basic elements of procedural due process of law require notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Troyer v. Adams,* 102 Hawai'i 399, 433–34, 77 P.3d 83, 117–18 (2003) (citations omitted). Further, the Labor–Management Reporting and Disclosure Act (LMRDA) provides the means for ensuring due process such that union members and officers are protected against discipline that affects their rights as union members.[20] *See Grand Lodge of Int'l Ass'n of Machinists v. King,* 335 F.2d 340 (9th Cir.1964). LMRDA § 411(a)(5) provides:

> [n]o member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been *(A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.* The written charges must be specific enough to inform the member of the offense allegedly committed.

*See Int'l Bhd. of Boilermakers v. Hardeman,* 401 U.S. 233, 235, 245, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971) (emphasis added). With respect to LMRDA § 411(a)(5)(C), the court in *Hardeman* noted:

> There remains only the question whether the evidence in the union disciplinary proceeding was sufficient to support the finding of guilt. Section 101(a)(5)(C) of the LMRDA guarantees union members a "full and fair" disciplinary hearing, and the parties and the lower federal courts are in full agreement that *this guarantee requires the charging party to provide some evidence at the disciplinary hearing to support the charges made.* This is the proper standard of judicial review. We have repeatedly held that conviction on charges unsupported by any evidence is a denial of

due process, and we feel that [§ ] 101(a)(5)(C) may fairly be said to import a similar requirement into union disciplinary proceedings. Senator Kuchel, who first introduced the provision, characterized it on the Senate floor as requiring the "usual reasonable constitutional basis" for disciplinary action, 105 Cong.Rec. 6720, and any lesser standard would make useless [§ ] 101(a)(5)(A)'s requirement of written, specific charges. *A stricter standard, on the other hand, would be inconsistent with the apparent congressional intent to allow unions to govern their own affairs, and would require courts to judge the credibility of witnesses on the basis of what would be at best a cold record.*

401 U.S. at 245–46, 91 S.Ct. 609 (emphases added) (some citations and footnotes omitted). *See also Charron v. Am. Fed. of State, County and Mun. Employees Union,* 470 F.2d 156, 157 (6th Cir.1972) ("We are required only to determine whether there was 'some evidence' offered by the Union to support the finding of guilt on some or all of the charges against appellant Charron in the disciplinary hearing.") (Citing *Hardeman,* 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 10; *Lewis v. AFSCME,* 407 F.2d 1185 (3rd Cir.1969); *Burke v. Int'l Bhd. of Boilermakers,* 417 F.2d 1063 (9th Cir.1969)).

■ In the instant case, ILWU provided Casumpang with adequate notice when it advised him, in writing, on January 7, 1998 that charges for "various violations of the Constitution and violations of a Maui Division Trial Committee 'Determination and Order' dated April 16, 1996," were filed against him. The notice also informed him of a scheduled hearing and trial to be held on January 16, 1998 and included a copy of the charges. The written charges, therefore, constituted adequate notice to inform Casumpang of the alleged offenses.

---

**20.** In *Snyder v. Freight, Const., General Drivers, Warehousemen and Helpers,* 175 F.3d 680 (9th Cir.1999), the court noted that:

> Union officers, like union members are protected by the LMRDA against discipline that affects their rights as union members. The [U.S.] Supreme Court has held specifically that a "fine" is a "punitive action taken against union members as members."

*Id.* at 687 n. 11 (quoting *Finnegan v. Leu,* 456 U.S. 431, 437–38, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982)).

As Casumpang was fined by the union, he is protected against improper discipline by the LMRDA.

Second, the requirement of reasonable time to prepare a defense was also satisfied. The investigation of Casumpang's activities as an electrical contractor began two years earlier in 1996 when the first charges were filed against him for the same violations. Despite the Trial Committee's cease and desist order, Casumpang continued his electrical contracting activities. On December 23, 1997, ILWU requested information from Casumpang regarding his electrical contracting activities for its "Investigation of Gainful Position"; written charges were filed on January 7, 1998, with a hearing held on January 16, 1998. Casumpang, who was involved for nearly two years in an ongoing dispute with the union regarding his electrical contracting activities and who had been issued a cease and desist order, had adequate time to prepare a defense to the charges against him.

Finally, Casumpang was afforded a full and fair hearing. At the trial before the Judicial Panel, the union and Casumpang each called six witnesses, and both sides offered exhibits into evidence. The district court found that "[a]ll parties were afforded a full and fair opportunity to call and to question witnesses and to present documentary and other evidence." Moreover, at no time did Casumpang challenge any of the panel members on grounds of bias or prejudice, nor did he request a continuance of the hearing or trial. Thus, we agree with the district court's finding that Casumpang was afforded a full and fair hearing. FOF no. 30. Consequently, we hold that the district court did not err in concluding that Casumpang was provided adequate due process.

b. *reasonableness of the fine*

■ In amending its July 19, 2001 Order, the district court determined that the $7,636 fine imposed on Casumpang was reasonable. Casumpang contends that the district court erred in its determination because the fine was unreasonably high.

The United States Supreme Court has acknowledged the role of the state courts in determining the reasonableness of union fines, stating that "our review of state court cases decided both before and after our decisions in *Allis–Chalmers* and *Scofield* reveals

that state courts applying state law are quite willing to determine whether disciplinary fines are reasonable in amount." *NLRB v. Boeing Co.*, 412 U.S. at 76–77, 93 S.Ct. 1952. This court has noted that reasonableness is generally a question of fact. *AMFAC, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 107, 839 P.2d 10, 24 (1992). We, therefore, review the district court's determination that the fine imposed on Casumpang was reasonable for clear error. In evaluating the reasonableness of a fine imposed by a union, the court in *Smith* stated that:

> Among the factors considered by the courts in making a determination as to whether the fine is arbitrary and unreasonable are: (1) methods and formulas used for calculation, (2) the member's conduct for which the fine was imposed, (3) income of the member, (4) amount of fine, (5) resulting harm or damage to the union or its other members, (6) nature of offenses being punished, (7) manner and extent to which the member benefit[t]ed or profited, and (8) the current economic conditions.

602 N.E.2d at 788.

In the instant case, ILWU maintains that:

> [A] number of significant factors were properly considered by the union in determining the 9–year suspension and $7,636 fine against Casumpang. Casumpang had been forewarned that engaging in activities as an electrical contractor was a "conflict of interest" with the duties of a business agent at least twice before. Article II of the constitution served an important and valid purpose. [Casumpang] was paid over $50,000 annually as a business agent, and improperly earned $7,636 doing electrical contracting work in 1996 only. The judicial panel found that Casumpang has attempted to deliberately conceal his activities as an electrical contractor. . . . [T]he amount of the fine was based on the amount Casumpang earned improperly by his work as an electrical contractor.

The union's basis for its fine considers nearly every one of the above listed factors, including Casumpang's repeated disregard for the union's constitution, bylaws, and orders to cease engaging activities that conflicted with

426

his duties as an ILWU official. Casumpang was first ordered to stop all electrical contracting activities effective April 18, 1996; however, within nineteen days thereof (on May 6, 1996), he submitted electrical permit applications and obtained approval to perform work as an electrical contractor for Mr. and Mrs. Felino Garcia. *See supra* note 10. Although Casumpang may have believed that his April 22, 1996 request to the LEC for authorization to conduct his electrical contracting business would be granted, it was, in fact, denied on June 4, 1996. *See supra* note 9. Nevertheless, Casumpang continued to violate the cease and desist orders by submitting electrical permit applications for and/or contracting with nine more homeowners or tenants. *See supra* note 10. Moreover, while serving as a union official (first as a division representative in 1993 and 1994, then as a business agent from 1995 to January 1998), Casumpang earned nearly $21,800 in gross revenues from unauthorized electrical contracting work as the owner and operator of Sea Breeze Electric in 1994, 1995, and 1996. *See supra* note 13. During the same period, Casumpang received more than $50,000 annual compensation as ILWU's business agent. Inasmuch as the ILWU limited its allegations of unauthorized contracting work to those that occurred after April 18, 1996, the Judicial Panel imposed a fine of $7,636, which appears to represent the last three quarters of unauthorized proceeds generated by Casumpang's sole proprietary business, Sea Breeze Electric. *See supra* note 13. Prior to April 18, 1996, Casumpang had received over $14,000 from unauthorized electrical contracting work, *id.*, for which he was not previously fined. Thus, the $7,636 fine imposed by the Judicial Panel can hardly be said to be unreasonable, and the district court's finding of reasonableness cannot be said to be clearly erroneous.

Finally, it would undermine the union's power to promote solidarity among its members were we to interfere with its reasonable disciplinary actions against an official who knowingly and deliberately violated the union's own constitution and orders. Thus, in light of the facts and circumstances herein, we conclude that the district court's finding of reasonableness is supported by substantial evidence. Accordingly, we affirm the district court's determination that the fine imposed was reasonable.

## IV. CONCLUSION

For the foregoing reasons, we affirm in part the district court's July 19, 2001 FOFs, COLs, and Order to the extent that it dismissed Casumpang's claim. In light of our conclusions that the ILWU's fine was permitted by its constitution and bylaws and that due process and reasonableness requirements have been met, we vacate in part the July 19, 2001 Order to the extent that it dismissed ILWU's counterclaim and remand this case to the district court for entry of judgment in favor of ILWU and against Casumpang in the amount of $7,636.00.

